UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| DANIEL E. MUTTY,            ) | |
| )| |
| Plaintiff        ) | |
| ) | |
| v.                          ) | Civ. No. 08-178-B-W |
| ) | |
| MICHAEL ANDERSON,           ) | |
| ) | |
| Defendant       ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Daniel Mutty initiated this action against Michael Anderson alleging that Anderson sprayed him with mace in September 2006 without justification when Mutty was an inmate at the Washington County Jail where Anderson was a corrections officer. Mutty also asserts that Anderson did not provide him with adequate medical care after the application of the mace. Mutty alleges that he has suffered loss of eyesight and pain. Mutty further alleges in his amended complaint that his due process rights were violated by Anderson when he placed him in lockdown prior to Mutty's exhaustion of his right to appeal the disciplinary determination which justified his lockdown. Finally, Mutty seeks to hold Anderson liable under the Maine Tort Claims Act. Mutty has not responded to the motion for summary judgment even though he was given an extension to due so until January 9, 2009. This case was referred to me on February 5, 2009, so Mutty has had ample opportunity to file a response. Having analyzed the merits of Mutty's claims based on the record before me, I recommend that the Court grant the motion for summary judgment as to all claims against Anderson.

***DISCUSSION***

A.     **Summary Judgment Standard**

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (quoting Federal Rule of Civil Procedure 56(c)).  I draw all reasonable inferences in favor of Mutty, but where he bears the burden of proof, he "'must present definite, competent evidence' from which a reasonable jury could find in [his] favor." Id. (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)).

Mutty has not presented any evidence in defense of the motion for summary judgment. However, this court,

> may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days. Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7-8 (1st Cir. 2002).

With regards to the failure of Mutty to respond, I do recognize that he filed a motion for an extension of the deadlines in the scheduling order on November 25, 2008 (Doc. No. 19) and explained that he was not receiving documents he had requested from Anderson regarding his disciplinary proceedings, that there had been delays in the deposition process, and that there had been a problem in obtaining his medical records.  Mutty also filed a motion to compel with

2

regards to his contention that Anderson was not providing the requested disciplinary records. (Doc. No. 18.)  On December 10, 2008, I held a telephone conference (Doc. No. 27) and instructed the attorney for Anderson to double check her files for the documents requested by Mutty and to turn these over to Mutty by no later than December 15, 2008, if there were such records to be had.  I denied Mutty's request to extend discovery and motion filing deadlines, but I did extend his time to respond to this motion for summary judgment until January 9, 2009. Mutty has not filed a response and he has not otherwise contacted the court, although he has demonstrated his ability to do so over the course of this litigation.

It has also not escaped my attention that Anderson has relied substantially on Mutty's own deposition to support the following factual statements.  This is not a case in which the moving party has ignored the competing version of facts offered by a pro se party.  Rather, Anderson has seemingly approached this motion with the conviction that he is entitled to judgment as a matter of law even crediting most of Mutty's own version of events.

**B.      The Constitutional Standards**

*1.      The Applicable Eighth Amendment Cruel and Unusual Punishment Standards*

Mutty was a pre-trial detainee at the time of the relevant events. With regards to his claim of the unconstitutional use of force and inadequate medical care, pretrial detainees, "through the Due Process Clause of the Fourteenth Amendment" enjoy "'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"   Calderon-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)); accord Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002).

Mutty's allegations concerning the unwarranted application of mace state an Eighth Amendment claim for cruel and unusual punishment. The First Circuit summarized in <u>Skinner v. Cunningham</u>:

> The framework for analyzing such claims was set forth by the Supreme Court in <u>Whitley v. Albers</u>, 475 U.S. 312 (1986), and <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992). Generally speaking, "[a]fter incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." <u>Whitley</u>, 475 U.S. at 319 (internal quotation marks omitted). The critical question in such a case is whether the force was applied "maliciously and sadistically for the very purpose of causing harm," <u>id.</u> at 320-21, rather than "in a good-faith effort to maintain or restore discipline." <u>Hudson</u>, 503 U.S. at 7.

430 F.3d 483, 488 (1st Cir. 2005).

Mutty also alleges that Anderson is responsible for not providing him with adequate medical care in the wake of the macing. The denial of necessary medical care can rise to the level of an Eighth Amendment violation, <u>see generally</u> <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994); <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), but to avoid summary judgment Mutty must create a genuine dispute that "(1) the defendant knew of (2) a substantial risk (3) of serious harm and (4) disregarded that risk." <u>Calderon-Ortiz</u>, 300 F.3d at 64.

### 2. *Procedural Due Process*

There is no question that pre-trial detains have procedural due process rights prior to the imposition of disciplinary actions. <u>See</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 555-71 (1974); <u>Surprenant v. Rivas</u>, 424 F.3d 5, 18 (1st Cir. 2005). Unlike <u>Wollf</u>, his case does not require analysis of the extent of the procedural protections afforded detainees as part of a disciplinary action. Mutty's theory is that somehow Anderson unilaterally short circuited his rights by placing him in lock-down even though he had expressed a desire to appeal.

### C. Undisputed Facts

4

Michael Anderson has been a corrections officer at the Washington County Jail since 2000. (SMF ¶ 1.) In June 2006, Mutty was incarcerated at the Washington County Jail on charges of aggravated criminal mischief, reckless conduct, and several other charges. (Id. ¶ 2.) Mutty was incarcerated for several months as a pretrial detainee before he was convicted of these charges because he could not make bail. (Id. ¶ 3.) At the time of the incidents alleged in the complaint, Mutty was awaiting trial on these charges. (Id. ¶ 4.)

On August 24, 2006, Anderson informed Mutty that he was wanted downstairs. Mutty asked why and Anderson told him he did not know why. (Id. ¶ 5.) Anderson asked Mutty more than once to go downstairs, but Mutty refused. (Id. ¶ 6.) After Mutty was asked to go to intake several times and refused, and Anderson explained that he did not know why Mutty had to go down to intake, Anderson told Mutty that he would sprayed be with pepper spray. (Id. ¶ 7.) This incident was resolved when Sgt. Spencer came up to speak to Mutty and told Mutty that he was going to court. (Id. ¶ 8.)

On September 10, 2006, Mutty confronted another inmate about the other inmate's slamming doors. This led to an argument and eventually a physical altercation. (Id. ¶ 9.) Anderson was aware that Mutty was involved in this fight with another inmate. (Id. ¶ 10.) As a result of prior incidents and interactions between Anderson and Mutty, Anderson believed that Mutty had a propensity for violence and that when Mutty began to escalate his behavior it needed to be stopped immediately before it got out of control for safety and security purposes. (Id. ¶ 11.)

On September 15, 2006, the Disciplinary Board met to consider charges against Mutty of disorderly behavior, refusing to obey an order, and fighting stemming from the incidents on August 24, 2006, and September 10, 2006. (Id. ¶ 12.) Washington County Jail's Policy No. F-

5

200 entitled "Inmate Discipline Procedures" governed the procedure used by the Disciplinary Board. (Id. ¶ 13.). Mutty was found guilty on the charges of fighting and disorderly behavior. He received 30 days lockdown for fighting and five days suspended for the disorderly behavior charge. (Id. ¶ 14.)

Anderson served Mutty the Disciplinary Board results and informed Mutty that he had received thirty days lockdown with five days suspended. (Id. ¶ 15.) Disciplinary lockdown involves spending approximately 22 hours a day in a cell with one hour out of the cell to exercise and one hour out of the cell to shower, make phone calls, or take care of other tasks. During disciplinary lockdown the inmate may be required to eat in his cell or may be allowed out to eat, depending on the situation. (Id. ¶ 16.) Anderson asked Mutty if he wished to appeal the decision of the Board and Mutty stated that he did wish to appeal the decision. (Id. ¶ 17.). Anderson told him he had to put his appeal in writing, but Mutty said he would not put it in writing because of pending criminal charges. (Id. ¶ 18.) Anderson then secured Mutty in his cell. (Id. ¶ 19.) Mutty then demanded that he be let out of lockdown because he was appealing the decision. (Id. ¶ 20. The policy of Washington County Jail is to lock an inmate down based on a Disciplinary Board decision whether or not that inmate indicates he wants to appeal. (Id. ¶ 21.)

After being locked down Mutty became angry. He turned around and began kicking the cell door. (Id. ¶ 22.) Anderson asked Mutty to stop kicking the door, but Mutty continued to kick the door very hard. (Id. ¶ 23.) Corrections Officer Lyons and Cpl. Burns came to the cell and Cpl. Burns asked Mutty to stop kicking the cell door. (Id. ¶ 24.) Mutty stated that he was not going to stop kicking the door until he was released from lockdown. (Id. ¶ 25.)

Mutty was handcuffed and taken down to a holding cell. (Id. ¶ 26.) Mutty was placed in leg shackles prior to being placed in the holding cell. (Id. ¶ 27.) Mutty was then placed in a

holding cell and the door was secured. (Id. ¶ 28.) After being placed in the holding cell, Mutty kicked the cell door two or three times. (Id. ¶ 29.) Anderson asked Mutty to stop kicking the door. (Id. ¶ 30.)

The cell door has two glass windows in it. One of these windows is in the lower half of the door and the second window is in the top half of the door. (Id. ¶ 31.) Occasionally, an inmate is able to break the glass of a cell door and this creates a safety hazard to inmates and staff. This also makes a cell useless until the glass can be replaced which can take two to three days. (Id. ¶ 32.) Anderson has seen other inmates break the glass in the holding cell. (Id. ¶ 33.)

When Mutty continued kicking the door Anderson was concerned for Mutty's safety and the safety of other inmates and staff. (Id. ¶ 34.) Anderson's supervisor told Anderson to spray Mutty. (Id. ¶ 35.) After Mutty had kicked the door in the holding cell two to three times, he started to sit down on a bench in the cell. As he sat down, Anderson opened the cell door and started to spray Mutty with pepper spray. (Id. ¶ 36.) Mutty stuck his head into the corner of the cell to get away from the spray and Anderson sprayed him again. (Id. ¶ 37.) In order to be most effective, pepper spray needs to make contact with the face. (Id. ¶ 38.) Anderson believed he needed to spray Mutty a second time because Mutty had covered his face. (Id. ¶ 39.)

After being sprayed Mutty became very angry. He was yelling and banging his head off the door. (Id. ¶ 40.) Captain Gross came in and was able to calm Mutty down. (Id. ¶ 41.) Mutty alleges that he asked for medical attention "because [he] had been maced in the eyes, and [he] had never been maced before. So [he] wasn't sure of what the reaction was that [he] was going to have . . ." (Id. ¶ 42.) The corrections officers took Mutty out of the cell, gave him a bunch of towels, and allowed him to shower. (Id. ¶ 43.) Mutty had difficulty showering because of the burning, so he was given a packet of chemicals to help alleviate the burning sensation. (Id. ¶ 44.)

Pepper spray is oil based and the chemical that was used to alleviate the burning is a wipe that is specially made to take oil off. (Id. ¶ 45.) Mutty used the packet and then went back into the shower area to continue to clean himself off. (Id. ¶ 46.) After being decontaminated, Mutty was taken to a different holding cell. (Id. ¶ 47.)

Mutty alleges that he requested medical attention again either later that day or that night because the spray had gone from his hair into his eyes. (Id. ¶ 48.) At that time, Mutty was given other packages of this chemical and a corrections officer heated up towels for him to clean himself off. (Id. ¶ 49.) Anderson was not present when Mutty was decontaminated a second time. (Id. ¶ 50) Mutty did not ask to see the medical department after this. (Id. ¶ 51.)

After this incident, Mutty was placed in lockdown for approximately three and a half days as a result of the Disciplinary Board decision. (Id. ¶ 52.) After the three and a half days the Disciplinary Board's decision was reversed on appeal and he did not serve any additional time for these charges. (Id. ¶ 53.)

**D.      The Merits of the Constitutional Claims**

With respect to the Eighth Amendment cruel and unusual punishment claim Mutty has failed to create a genuine dispute that Anderson used the mace "maliciously and sadistically for the very purpose of causing harm," Whitley, 475 U.S. at 320-21; the uncontested facts are that the mace was applied on the instructions of Anderson's supervisor "in a good-faith effort to maintain or restore discipline," Hudson, 503 U.S. at 7. There is no dispute that in protest of his placement in lockdown Mutty persisted in kicking of his cell door and, in turn, the holding-cell door which had a window that could break as a result. Although the amended complaint contains allegations that Mutty was behaving by the time the mace was administered, Mutty has

8

not introduced this as a fact in the summary judgment record.  There in nothing in this record from which the court can infer that Anderson acted with malice.

Anderson is entitled to judgment on the Eighth Amendment deliberate indifference to medical needs claim because of a similar failure of proof on Mutty's part.  Mutty alleges that he asked for medical attention because he had not been maced before and was concerned about what his reaction might be.  The corrections officers took Mutty out of the cell, gave him a bunch of towels, and allowed him to shower.  Mutty had difficulty showering because of the burning, so he was given a packet of chemicals to help alleviate the burning sensation. Mutty used the packet and then went back into the shower area to continue cleaning himself off.  Mutty maintains that he requested medical attention again either later that day or that night because the spray had gone from his hair into his eyes and Mutty was given other packages of this chemical and a corrections officer heated up towels for him to clean himself off. There is no dispute that Anderson was not present when Mutty was decontaminated a second time.  Nor is there a dispute that Mutty did not seek medical attention after this. The facts here are that Anderson had very little involvement with the response to the aftermaths of the macing but that he was present and knew that efforts had been taken to clean the mace off of Mutty.  This is not the sort of factual mix that makes for a triable <u>Farmer</u>/<u>Estelle</u> deliberate indifference claim.

The facts relevant to the process afforded Mutty prior to his lockdown are that on September 15, 2006, the Disciplinary Board met to consider charges against Mutty of disorderly behavior, refusing to obey an order, and fighting stemming from the incidents on August 24, 2006, and September 10, 2006.  Mutty was found guilty on the charges of fighting and disorderly behavior.  Anderson served Mutty the Disciplinary Board results and informed Mutty that he had received thirty days lockdown with five days suspended. Anderson asked Mutty if he wished to

9

appeal the decision and Mutty stated that he did wish to appeal the decision. Anderson told him he had to put his appeal in writing, but Mutty said he would not put it in writing because of pending criminal charges. Anderson then secured Mutty in his cell and Mutty demanded that he be let out of lockdown because he was appealing the decision. The policy of Washington County Jail is to lock an inmate down based on a Disciplinary Board decision whether or not that inmate indicates he wants to appeal. Anderson followed policy and procedure and was not acting unilaterally to interfere with Mutty's due process rights.[1]

Should the court disagree with my conclusion that there has been no constitutional violation, Anderson does assert: "[E]ven if the court were to discern some opaque constitutional infirmity in Anderson's actions, he is nevertheless entitled to qualified immunity on these three claims." (Mot. Summ. J. at 6.) I see no reason to address this argument at this juncture.

### E. Maine Tort Claims Act Liability

As Anderson argues, on the record before the Court, he is entitled to discretionary immunity under the Maine Tort Claims Act vis-à-vis his placement of Mutty in lockdown, the application of mace, and the response to Mutty's request for medical care. Section 8111(1)(C) of title 14 of the Maine Revised Statutes provides as relevant:

> Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following: . . . (C)performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and

---

[1] Anderson has briefed the merits of an official capacity claim against Anderson as being "essentially the same as bringing a claim against Washington County." (Mot. Summ. J. at 15-16 & n.6 )(citing Monnell v. Dept. of Soc. Servs. of New York, 436 U.S. 658, 691 n.55 (1978) and Brandon v. Holt, 469 U.S. 464, 468-473 (1985)). There is nothing in record that would warrant a discussion of Anderson's potential liability on such a theory as to any of the onstitutional claims. What is more, even if Anderson as a correctional officer could be held liable in his official capacity, the fact that there is no underlying constitutional violation precludes such a claim. See Wilson v. Town of Mendon, 294 F.3d 1, 6 -7(1st Cir. 2002); see also Bowman v. Corrections Corp. of America, 350 F.3d 537, 544-47, (6th Cir. 2003).

> whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid; . . .
>
> The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees, . . . who are required to exercise judgment or discretion in performing their official duties.

14 M.R.S. § 8111(C).

The Maine Law Court explained in Roberts v. State:

> We have utilized a four-factor test to determine whether discretionary function immunity applies.
>> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?
>
> Adriance v. Town of Standish, 687 A.2d 238, 240 (Me.1996) (quoting Darling v. Augusta Mental Health Inst., 535 A.2d 421, 426 (Me.1987)).
>
> Relying on the four factors, without going through them in detail, we held, in Erskine v. Commissioner of Corrections, 682 A.2d at 686, that "[t]he management and care of prisoners is a discretionary function." The federal district court, interpreting the Maine Tort Claims Act, came to the same conclusion in Ellis v. Meade, 887 F.Supp. 324 (D.Me.1995). In that case the court concluded that a jail guard was carrying out a discretionary function when he slapped a restrained prisoner on the buttocks. See id. at 331.

1999 ME 89, ¶¶ 8-9, 731 A.2d 855, 857. Roberts emphasized, "there can be no dispute that corrections is a basic governmental program and that the supervision of inmates is essential to a corrections program." 1999 ME 89, ¶ 10, 731 A.2d at 857

The summary judgment record is that Anderson acted in all respects in his capacity as a correction officer responsible for supervising Mutty. This is true vis-à-vis his action locking

11

Mutty down, insisting that he request an appeal in writing, spraying him with mace when ordered to do so, and in responding with other officers to Mutty request for assistance in removing the mace.

## *Conclusion*

For the reasons stated above, I recommend that the Court grant this unopposed motion for summary judgment.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

February 6, 2008